[Civ. No. 1574. Third Appellate District.—September 28, 1916.]

## SLAMA TIRE PROTECTOR CO. (a Corporation), Appellant, v. G. A. RITCHIE et al., Copartners, Respondents.

CONTRACT FOR PURCHASE AND SALE OF TIRE PROTECTORS—RELATIONSHIP CREATED — UNCERTAINTY OF CONTRACT — FINDINGS CONCLUSIVE.—Upon an appeal taken from the judgment in favor of the defendants in an action to recover an alleged balance due on account of a certain quantity of tire protectors shipped to them by the plaintiff, where the single question presented by the appeal is whether the contract upon which the action was founded was one whereby the plaintiff agreed to sell and the defendants agreed to buy the protectors at the prices and upon the conditions specified in the contract, or was one whereby the plaintiff agreed to ship or make consignments of the protectors to the defendants upon the understanding or condition that the protectors to be so shipped or consigned should be paid for only when they were sold by the defendants, and the contract upon its face is ambiguous and uncertain as to the nature of the relation which the parties intended thereby to establish between themselves, the finding of the trial court will not be disturbed.

ID.—RELATIONSHIP CREATED BY CONTRACT—UNCERTAINTY—CONSTRUCTION OF TRIAL COURT—APPEAL.—Where a writing is so characterized by ambiguity and uncertainty as to the nature of the relation which the parties intended thereby to create between themselves that either of the two constructions of the contract urged by the

respective parties might upon reasons equally cogent be sustained, it is not within the proper or legal functions of a court of review to declare that the construction given the writing by the trial court should be rejected and supplanted by the other construction of which the instrument is susceptible.

Id.—Nature of Transaction—Uncertainty of Contract—Question of Fact.—Where the contract is uncertain or not clear as to its purpose and effect, the question whether the transaction of which it purports to be the evidence is a sale or a bailment is to be determined from all the circumstances giving rise to it, and on conflicting evidence a question of fact is presented for the jury's determination.

APPEAL from a judgment of the Superior Court of Kings County, and from an order denying a new trial. M. L. Short, Judge.

The facts are stated in the opinion of the court.

Miller & Miller, for Appellant.

H. Scott Jacobs, and H. P. Brown, for Respondents.

HART, J.—This appeal is by the plaintiff from the judgment and the order denying it a new trial.

The controversy arises out of a contract entered into between the plaintiff and the defendants, as copartners, at Kansas City, Missouri, on the eighth day of October, 1910. Said contract is made a part of the complaint.

The plaintiff is a corporation organized under the laws of the state of Nebraska.

The defendants, at the time of the making of the contract mentioned, were copartners, doing business in the city of Sacramento, under the firm name of Ritchie & Heriot.

The single question presented by this appeal is whether the contract upon which the action is founded was one whereby the plaintiff agreed to sell and the defendants agreed to purchase certain tire protectors at the prices and upon the conditions therein specified, or was one whereby the plaintiff agreed to ship or make consignments of the tire protectors to the defendants upon the understanding or condition that the protectors to be so shipped or consigned should be paid for only when they were sold by the defendants; or, to put the proposition in another form, it is, whether the parties to the con-

tract intended it to operate only to create between them the relation of principal and agent or that of creditor and debtor, or, in other words, whether the delivery of the goods to the defendants was intended by the agreement to constitute an absolute sale thereof. The proposition thus stated calls for a construction of said contract, or, what practically amounts to the same thing, involves the question whether the court's findings, which necessarily involve and exemplify its construction of the contract, derive sufficient support from the evidence.

The contract in full reads as follows:

## "AGREEMENTS.

"Made this eighth day of October, 1910, by and between Slama ˙Tire Protector Company, Kansas City, Missouri, known as the party of the first part and Ritchie and Heriot of Sacramento, California, known as party of the second part, witnesseth:

"That whereas, Party of the first part is engaged in selling Tire Protectors, known as Slama Tire Protector, which product is protected by various letters patent of the United States of America, and

"Whereas, the party of the second part is desirous of purchasing and selling said Protectors in the States of Washington, Oregon, California, Arizona and Nevada.

"Whereas, the party of the first part is willing to permit party of the second part to sell said protectors in accordance with terms mentioned herein.

"Now, therefore, In consideration of the premises and of One Dollar by each of the parties hereto, the other in hand paid, receipt whereof is hereby acknowleged, said parties do covenant and agree to and with each other as follows:

"1. The˙parties of the second part agree to purchase from said first party a total of five hundred pair of above referred protectors for each year of this contract to be taken either on or before expiration of each year of contract and such quantity that is purchased over the stipulated amount can be applied toward total purchases of next succeeding year's purchases.

"2. Said second party agrees that they will not sell any of said protectors at less than the established list prices attached herewith, marked Exhibit A, when selling to the con-

sumer nor allow any of their sub-agents to violate this agreement.

"3. The second party agrees to spend the sum of Two Thousand Dollars ($2,000.00) annually during the life of contract towards advertising said protectors in manner they see fit for the benefit of the sale of such protectors and all expenditures for such advertising to be reported by verified statements to said first party. It is also understood that any amount spent over and above this sum, can be applied toward making total of the amount to be spent during the life of this contract.

"4. The party of the first part agrees to furnish party of the second part such quantities of circular matter with the said second party's name printed thereon at any time they are requested to do so and in such quantities as will be necessary for the second party to properly circularize the territory covered and allotted to said second party.

"5. The said party of the first part agrees to turn over all inquiries, orders and business coming from the territory or states specified herein.

"6. Said first party agrees to supply a sufficient stock of said protectors to meet all reasonable demand to said second party and a report of stock on hand is to be made the first day of each month to said first party by said second party. All goods taken from such stock to be paid for as provided hereinafter. New and unused protectors are only to be considered as stock on hand. All stock on hand to be kept fully insured, and all freight and storage charges to be paid by second party and in the event of any of said goods being returned for any reason, freight is to be prepaid back to the factory.

"7. The price to be paid to first party for such protectors as they shall purchase will be list price as per Exhibit A. attached herewith, less discount of 30 per cent therefrom with an additional discount of 5 per cent for cash, payable the tenth of each month of net cash, if paid at the end of each month. If the said second party shall comply with all the terms and conditions of this contract and as soon as the total purchases paid for, amount to two hundred fifty pair (250) then the said first party will allow an additional discount of 5 per cent from all protectors purchased. Should these same conditions be complied with and the total paid

for purchases amount to five hundred pair (500) then another 5 per cent will be allowed, thus making a total discount from the list price in that event amount to 30-5-5 per cent and the extra 5 per cent for cash. In the event of the maximum discount being reached, permission is given as a matter of convenience to figure a total net discount of 40 per cent.

"8. Privilege is given to said second party to call and advertise our product under the name of 'The Armor Plate Tire Protector.'

"9. The life of this contract shall be for a term of five (5) years, but shall not be assignable by the party of the second part."

Annexed to the contract is a schedule containing a list of the prices which the defendants were to pay for the goods consigned to them by the plaintiff under the terms of the agreement and for not less than which they were to sell them to the public.

The complaint avers: "That under and pursuant to said contract plaintiff shipped to defendants at Sacramento, California, at defendants' instance and request, between the eighth day of October, 1910, and the first day of May, 1911, tire protectors of the value $18,700.45, estimated at the price provided for in said contract; that, as plaintiff is informed and believes, and on such information and belief alleges, all of said tire protectors so delivered to defendants as aforesaid have been sold by defendants."

It is alleged that of the sum above mentioned there has been paid by the defendants to the plaintiff the sum of $2,741.75, only, and that there is consequently due the latter from the former the sum of $15,958.70.

A general demurrer to the complaint having been overruled, the defendant Ritchie answered.

The answer admits the making of the contract mentioned in the complaint; admits the shipment to the defendants by the plaintiff of a certain quantity of the protectors, but denies that they were of the value of $18,700.45, averring, however, that they were of the value of $28,333.45; denies that said tire protectors so delivered to the defendants have been sold by said defendants, but admits that of the protectors so delivered to the defendants the latter have sold "about $6,275 worth, only," which amount it is alleged has been paid to the plaintiff.

The answer sets up a number of special defenses and counterclaims growing out of alleged breaches of the agreement by the plaintiff, said counterclaims amounting in the aggregate to the sum of forty-two thousand dollars. As to these, however, it may here be remarked that the court found, and appears to have been justified in so finding, that the defendant was entitled to nothing on the counterclaims pleaded by him. They, therefore, need not be further noticed.

It is further alleged in the answer that, after the contract in question was made, the partnership existing between Ritchie & Heriot at the time of the execution of said instrument, was, by the mutual consent of said partners, dissolved, and that the said contract was thereupon assumed by the said Ritchie, "who continued to transact the business theretofore conducted by the said copartnership."

The court found that the pleaded contract was entered into between the parties as alleged in the complaint; that the plaintiff shipped to the defendants at Sacramento tire protectors of the value of $18,700.45; that the defendants did not sell all the protectors so shipped, but did sell a portion thereof, amounting in value to the sum of $2,741.75; that all of said goods were shipped to and received by the defendants to be paid for when sold, and not otherwise; that no part of the said sum of $18,700.75, the value of the protectors shipped to the defendants, has been paid by the said defendants, except the sum of $2,741.75, "but the court finds that it is not true that there is a balance due from the said defendants to plaintiff in the sum of $15,958.70, or any other sum."

It must be conceded that the contract, upon its face, is rather ambiguous and uncertain as to the nature of the relation which the parties thereto intended thereby to establish between themselves. That the construction placed upon it by the trial court, as evidenced by its findings, is reasonable and sustainable by certain language of the instrument, no one reading the writing will for an instant doubt. On the other hand, language is used from which the conclusion might justly be justified that the intention was that, while the defendants were to enjoy the exclusive right and privilege of selling the tire protectors within the territory designated in the contract, they were, nevertheless, to be required to purchase the goods outright from the plaintiff on the terms and

conditions of the agreement, and that each order or shipment was to constitute an absolute sale.

The preamble to the contract contains the declaration that "the party of the first part is willing to *permit* party of second part to *sell* said protectors in accordance with the terms mentioned herein." Among the terms of the contract is a provision that the prices at which the defendants are to sell the article must not be less than the established prices indicated in the schedule attached to the contract exhibiting a list of prices, "nor allow any of their *subagents* to violate this agreement." This language, viewed by the light of that of the preamble above referred to, appears to make it very clear that the intention was that the defendants were by the contract to act as mere selling agents of the plaintiff. As counsel for the defendant well suggest: "The idea of subagents must presuppose an agent. . . . There could be no reason for the expression, 'subagent,' unless the parties had in mind that the second parties were the agent of the first party in the matter of the distribution of these protectors."

Again, the third paragraph of the contract binds the defendants to the obligation of expending the sum of two thousand dollars each year during the life of the contract for the purpose of advertising the protectors and to render to the plaintiff a verified statement of expenditures for such purpose. Such a provision is a most unusual one in a contract providing for the absolute or unconditional sale of a commodity. If the contract was intended as one for the absolute sale of the article at the prices specified therein, is it reasonable to suppose that the defendants would have bound themselves for a period of five years to the expenditure of such a large sum each year of the five for such a purpose? Indeed, if it had been intended as such a contract, is it reasonably to be supposed that the plaintiff, having received its price for its goods, would have exacted such an agreement from the purchaser? The burden imposed by said provision as a condition upon which a party might acquire the rights and authority of a selling agent for another would not be, *per se,* an unreasonable one; for, as counsel for the defendant suggest, the clause may the more reasonably be construed as involving an agreement on the part of the defendants to expend the amount required for advertising as a *bonus* for the right and privilege of acting as the selling or distributing

agents of the plaintiff within the designated territory. Then there is the clause whereby it is covenanted that the plaintiff will supply the defendants with a sufficient "stock of said protectors to meet all reasonable demands," the defendants to report to the plaintiff on the first day of each month the amount of stock on hand. Said clause further provides that the defendants were to keep the stock on hand fully insured. Such conditions as these are rarely to be found in a contract of sale, but are peculiarly appropriate to a bailment or some other transaction by which it is not intended that the consignee of the goods shall acquire title thereto.

Thus we could proceed and point out other language of the contract which, taken alone or viewed in connection with the provisions of the instrument above referred to, clearly implies that the contract was intended to establish the relation of principal and agents between the parties and not intended as a contract for the sale of the goods; but it is unnecessary further to examine the contract for this purpose. The instrument is presented herein in full, and there can be no difficulty in observing from its language that the conclusion arrived at by the court below as to its legal nature, scope, and effect involves a reasonable view of the language of the writing.

We do not say that the provisions of the contract above specifically adverted to are wholly inconsistent with the theory that the transaction was intended as a contract of sale. What we do say is that the provisions are perfectly consistent with a contract creating an agency. Indeed, as declared, some of them are very rarely to be found incorporated into a contract for the absolute or unconditional sale of goods. And it should further be noted that the plaintiff appears to have proceeded in this action upon the theory that the transaction involved only a conditional sale of the protectors to the defendants. The complaint alleges, upon the information and belief of the plaintiff, that all of the protectors shipped to the defendants had been sold by the latter. If the transaction was in fact an absolute sale of the goods, why such an allegation in the complaint? What material difference could it make to the plaintiff whether the goods were or were not sold by the defendants if, in truth, the sale was absolute and title to the goods passed to the de-

fendants? The averment is obviously wholly inconsistent with the theory of an absolute or unconditional sale.

As suggested, however, it must be admitted that the contract contains some language which, if considered by itself or without reference to or consideration of other language of the instrument, might warrant the construction to which the writing is subjected by the plaintiff, viz., that it involves an agreement for the absolute sale of the tire protectors to the defendants. Indeed, it may justly be assumed to be true that the instrument is so characterized by ambiguity and uncertainty as to the nature of the relation which the parties intended thereby to create between themselves that either of the two constructions of the contract urged by the respective parties might, upon reasons equally cogent, be sustained. The question, therefore, then arises, assuming, of course, that no competent testimony extrinsic to the writing itself reflecting light upon the real intention of the parties has been received: Is it, in such a situation, within the proper or legal functions of a court of review to declare that the construction given the writing by the trial court should be rejected and supplanted by the other construction of which the instrument is susceptible? Manifestly, no reason can be conceived which would support an affirmative reply to that question. The appeal court could not adopt such a course in such a case without resorting to the exercise of arbitrary power. So, if there were no other evidence in this record but the instrument itself which throws or tends to throw any light on the relation which the parties by the contract intended to establish between themselves, we would feel constrained —indeed, it would be our duty—to uphold the construction given the contract by the trial court, as evidenced by its findings.

But there was introduced and received in the case some evidence extrinsic to the instrument itself which we think tends to support the trial court's construction. After the contract was made and a large stock of protectors had been shipped to the defendants, considerable correspondence by mail was carried on between the parties. Some of these letters were introduced in evidence. Excerpts from a few will be sufficient to indicate that the plaintiff understood the contract to call for a payment for the goods shipped to the defendants only when the latter sold the same.

In one of the plaintiff's letters to the defendants the following language was used: "It is also much to be regretted to note the exceptional dry weather California is experiencing, especially this being your first year with the Protectors and as you say, so much depends upon the weather in your section of the country. No doubt, however, when the rains do start, you will make up for lost time, which is surely hoped for, as you know by my previous letters that this amount of stock we have with you, has put us in a rather tight financial circumstances and caused us to borrow money from the banks in order to meet our own obligations which were necessarily increased on account of the anticipated business from you. We really realize your condition on account of the weather and have enough faith in you to know that if the business is to be had, you will get it. All we want is that you play the game square and you will find us easy people to get along with."

In the same letter reference is made to a proposition by the defendants to sell a portion of their territory to a Mr. Kaar for the sum of one thousand dollars, and the plaintiff wrote: "We were very much interested, however, in noting your proposition to Mr. Kaar and would like to know just what territory you intended turning over to him for this amount and also your reason for making a proposition of this kind. We were wondering if you are getting dissatisfied with the proposition or thought that Salt Lake City was a little out of your territory."

Again, the following letter, under date of February 24, 1911, was addressed by the plaintiff to the defendants: "We hardly know how to express ourselves in replying to your telegram in which you inform us that you have not sold any protectors for two months, and in this telegram you say there is none to make this month. We, of course, realize the dry weather had something to do with the sales falling off, but when they are reduced from what they were to absolutely nothing, we cannot help but think something is wrong, and you in our position would, of course, think likewise.

"We have treated you absolutely square in all of our dealings with you and expect the same from you. *If it is your intention to discontinue handling our protectors we wish you would say so at once and return what new unused stock you*

*have on hand by prepaid freight and remit for the balance
due us as per our agreement.*

"Stock that has been put to use is not returnable."

It is not necessary to enter herein upon an analytical examination of the above letters to show that their language clearly implies the relation of principal and agent between the parties. The letters sufficiently speak for themselves in that respect.

Other letters passing between the parties were introduced in evidence. In the place of presenting herein extracts therefrom, it is sufficient to say that said letters contained language clearly indicating that both parties to the contract understood the agreement to have been intended, not as a contract for the absolute sale of the goods, but merely to vest in the defendants the authority of agents in the sale of said goods within the several states named.

Many other significant considerations revealed by the correspondence between the parties might be mentioned, all tending to support the theory that the contract was intended as, and in fact was, a contract of agency, or, at the most, a conditional sale, the protectors consigned to the defendants to be paid for only when the goods consigned to the defendants were sold by them.

In addition to the foregoing considerations, the statements rendered to the defendants by the plaintiff of protectors shipped to the former may be referred to as indicating the view the plaintiff had of the character or nature of the contract. These statements were uniformly marked "consignment," and from this fact it is reasonably inferable that the plaintiff regarded the shipments under the contract as mere consignments and not as a delivery on the sale of the goods.

Our conclusion is, from all the facts and circumstances of the transaction involved here, as disclosed by the contract itself and other documentary proofs, that the court's findings are sufficiently supported; that, under the terms of the contract, as it is warrantably construed by the court, there could not be a completed sale until the defendants sold the goods to third parties. Until that occurred, the consignee was under no obligation to pay the listed prices therefor, and could have been compelled to surrender the goods to the consignor upon demand. (*Vermont Marble Co.* v. *Brow,* 109 Cal. 236, [50 Am. St. Rep. 37, 41 Pac. 1031].)

It is true, as the authorities declare, "the distinction between agency contracts creating bailments and contracts of sale is not always clear, . . . and in some cases a contract may be construed as creating merely an agency as between the parties where, as between the parties and a third person, it might be given the effect of a sale." (6 Corpus Juris, p. 1091.) There is no question of the rights of third persons involved in the transaction with which we are presently concerned.

After all, however, where the contract is uncertain or not clear as to its purpose and effect, the question whether the transaction of which it purports to be the evidence is a sale or a bailment is to be determined from all the circumstances giving rise to it, and, on conflicting evidence, a question of fact is presented for the jury's determination. (6 Corpus Juris, p. 1087.)

But counsel for the plaintiff contend that the "terms of selling these goods were to be determined by the defendant, and that he agreed to pay a fixed price for the goods," and declare that therefore the case here comes within the rule that where the consignee or factor is to sell upon terms fixed by himself, and is bound to pay to the consignor a fixed price, the contract is one of sale. (21 Am. & Eng. Ency. of Law, p. 520.) The contract here, however, expressly provides, as will be observed from a perusal of it, that the "second party agrees that they will not sell any of said protectors at less than the established list prices attached herewith, marked Exhibit A, when selling to the consumer, nor allow any of their sub-agents to violate this agreement." Thus it is plainly manifest that the defendants were not at liberty under the contract to fix their own minimum prices in selling the goods, but were to be governed in that respect entirely by the prices fixed by the consignor—the plaintiff itself.

We have neither been shown nor found a substantial reason for declaring that the trial court's construction of the contract is erroneous, and the judgment and the order are accordingly affirmed.

Chipman, P. J., and Burnett, J., concurred.